UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JORDAN ISAIAH MAURICE WATTS ,

                  Plaintiff,

v.

COUNTY OF KALAMAZOO et al.,

                  Defendants.

_____/

Case No. 1:25-cv-1073

Honorable Paul L. Maloney

## OPINION

This is a civil rights action brought by a county detainee under 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis* in a separate order. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted.

### Discussion

## I.    Factual Allegations

Plaintiff is presently incarcerated at the Kalamazoo County Jail (KCJ) in Kalamazoo, Michigan. The events about which he complains occurred at that facility. Plaintiff sues Kalamazoo

County, as well as the following KCF personnel in their official and personal capacities: Sheriff Richard Fuller, III; Lieutenant Unknown Faulk; Sergeants Unknown Erdos, Unknown Zimmer, Unknown Wheatley, Unknown Misner, Unknown Baumont, and Unknown Cattes; and Deputies Unknown Toth, Unknown Crump, and Unknown Powell.

Plaintiff alleges that on November 6, 2024, while in the isolation unit, he asked Defendant Toth if "she would pull [Plaintiff] out to make a lawyer call." (Compl., ECF No. 1, PageID.4.) Defendant Toth told Plaintiff no, and to ask the next shift. (*Id.*) According to Plaintiff, Defendant Toth said this in an aggressive and rude manner. (*Id.*) When Plaintiff replied that "the courts ordered the jail to allow [him] to be able to contact [his] lawyer," Defendant Toth walked away "mumbling very rude things[,] such as I don't have to do anything for a convict." (*Id.*) Plaintiff started to yell and press the emergency button to speak to a sergeant, but received no response. (*Id.*) Later that day, Defendant Toth returned and told Plaintiff he would be receiving a misconduct for yelling and excessive pressing of the emergency button. (*Id.*) According to Plaintiff, yelling is a misconduct per the rule book, but excessive pressing is not. (*Id.*)

On November 8, 2024, Defendants Erdos and Zimmer came to see Plaintiff and asked if he wanted a hearing, and if he did "it would start right now." (*Id.*) When Plaintiff asked what he was written up for, he was told yelling and insubordination. (*Id.*) Plaintiff asked why he had not received 24 hours' notice, and was told "it was not a right." (*Id.*) When Plaintiff asked what Deputy Toth had said Plaintiff did because it was not in the misconduct, Defendants Erdos and Zimmer told Plaintiff "they don't let inmates see what the deputies say[] in reports." (*Id.*) Plaintiff was also told that he would not be allowed to call witnesses. (*Id.*)

Plaintiff went on to explain that he was guilty of yelling but not insubordination because at no time did Defendant Toth give Plaintiff a direct order that he refused to follow. (*Id.*, PageID.5.)

Defendant Erdos told Plaintiff that yelling was insubordination, and Defendant Zimmer smiled at Plaintiff. (*Id.*) When Plaintiff continued to contest the fact that he was not being allowed to call witnesses, Defendants Erdos and Zimmer "walked off an[d] told [Plaintiff that he] was responsible/guilty." (*Id.*) Plaintiff received 10 days in segregation as a result. (*Id.*)

Throughout that day, Plaintiff asked various deputies what KCF considered to be insubordination, and all of them "responded that insubordination is disobedience to an order." (*Id.*) Plaintiff appealed the misconduct and filed a grievance. (*Id.*) He explained to Defendant Faulk that he did not receive proper notice and was not allowed to call witnesses. (*Id.*) Defendant Faulk responded and told Plaintiff that the hearing was proper. (*Id.*)

On December 9, 2024, Defendant Misner issued Plaintiff a misconduct for allegedly using another inmate's PIN to access visits. (*Id.*) Defendant Powell told Plaintiff to pack his things and that he was going to isolation. (*Id.*) Plaintiff asked Defendant Powell to get a sergeant because Plaintiff was "being treated differently than other similarly situated individuals." (*Id.*) Defendant Powell returned with Defendant Cattes, who told Plaintiff that he had to do five days in isolation for receiving two or more minor misconducts in a month. (*Id.*) Plaintiff responded that he had never received a hearing, and Defendant Cattes "ensured [Plaintiff] that [he] would get a hearing." (*Id.*) Plaintiff asked if "they were going to take [him] to isolation an[d] then state creating reasons to keep [him] there"; Defendant Cattes "told [Plaintiff] no." (*Id.*)

On Plaintiff's third day in segregation, Defendant Wheatley came for Plaintiff's hearing. (*Id.*, PageID.6.) During the hearing, Defendant Wheatley told Plaintiff that Defendant Powell had written Plaintiff up for insubordination stemming from the day Plaintiff had been moved. (*Id.*) Plaintiff explained that he had not been insubordinate and that Defendant Powell and Defendant Cattes had assured him that there would not be "reasons created to assure[] [Plaintiff was] housed

3

in that dungeon." (*Id.*) Plaintiff argued that he had not been given 24 hours' notice and asked to call witnesses. (*Id.*) Defendant Wheatley told Plaintiff that if Defendant Powell and Defendant Cattes had told Plaintiff that he would not receive any more misconducts from that day, then it would be dismissed. (*Id.*)

Defendant Wheatley left and returned about 45 minutes later. (*Id.*) He told Plaintiff that Defendant Cattes had confirmed what Plaintiff had said. (*Id.*) However, Defendant Wheatley had not talked to Defendant Powell. (*Id.*) Defendant Wheatley told Plaintiff that he was finding him guilty and sanctioning him with 10 days in segregation, "with only one hour out to shower [and] use the phone." (*Id.*) Plaintiff wrote grievances and kites to Defendant Faulk. (*Id.*) Defendant Faulk came to talk to Plaintiff, and told Plaintiff that "if they put every definition or every rule [the rule book] would be to[o] thick" and that "some things are common sense." (*Id.*) After about a week in segregation, Defendant Powell told Plaintiff that she had been ordered to write Plaintiff a misconduct, and that Plaintiff needed to "lay low because [Defendant] Misner ha[d] a target on [Plaintiff's] back." (*Id.*) Plaintiff "took this as a message to stop filing complaints and grievance against Misner." (*Id.*)

On January 12, 2025, as Plaintiff was being moved to a new housing unit, another inmate named Pratt gave Plaintiff a pair of socks in front of the deputies. (*Id.*) Plaintiff states that this interaction was recorded. (*Id.*) After Plaintiff's move, the deputies searched the socks and "found an unidentified pill." (*Id.*) Plaintiff explained that inmate Pratt had given him the socks. (*Id.*) Plaintiff told Defendant Crump that he could review the body cameras to see the interaction. (*Id.*, PageID.7.) Defendant Crump told Plaintiff to pack his property because he was going to segregation. (*Id.*) Plaintiff asked why, and Defendant Crump told Plaintiff for "misuse of medication." (*Id.*) Plaintiff responded that it was only a minor misconduct, and Defendant Crump

replied that it was now a major misconduct. (*Id.*) Plaintiff mentioned "that's not what the rules say," and Defendant Crump replied that the rules were wrong. (*Id.*)

When Plaintiff was placed in a segregation cell, he noticed that the sink was broken and that no water was available. (*Id.*) Plaintiff immediately notified non-parties Deputies McCormack and McKenzie; they tried to fix the sink, to no avail. (*Id.*) On Monday, Plaintiff let deputies know that he had no drinking water, and they told Plaintiff that they would submit a maintenance request. (*Id.*) On Tuesday, Plaintiff told non-parties Deputy Marshall and Nurse Becky that he had not had any drinking water for three days, and Nurse Becky brought Plaintiff a bottle of water. (*Id.*) Plaintiff alleges that he was "so thirsty it was unbearable," and that he asked to be moved but was told no. (*Id.*)

On Wednesday, Defendant Wheatley came to see Plaintiff for the misconduct hearing. (*Id.*) Plaintiff told Defendant Wheatley the misconduct had to be dismissed because it had been more than 72 hours; Defendant Wheatley "responded by saying he [was] only a few hours late." (*Id.*) Plaintiff also told Defendant Wheatley that he had no drinking water and was thirsty; Defendant Wheatley said he "would have maintenance check it out." (*Id.*) On Thursday, maintenance tried to fix Plaintiff's sink to no avail. (*Id.*) Plaintiff asked non-party Deputy Willard to be moved and to see community mental health (CMH) (*Id.*) Plaintiff was "very drained an[d] thirsty an[d] [his] mouth was dry." (*Id.*) According to Plaintiff, "CMH never came." (*Id.*, PageID.8.) That night, Plaintiff told non-party Deputy Bridges that he wanted to hurt himself. (*Id.*) Plaintiff avers that he "had to literally lie to get them to move [him] to a suicide watch cell to get some drinkable water." (*Id.*)

That Friday, Defendant Wheatley "brought [Plaintiff] a guilty finding on the misconduct an[d] [did not] tell [Plaintiff] why or what investigation he did." (*Id.*) Plaintiff appealed, and his

appeal was denied by Defendant Faulk. (*Id.*) Plaintiff also submitted a grievance about the conditions of confinement he experienced for five days and the fact that he had only been given one bottle of water. (*Id.*) Plaintiff also noted how his mental health was deteriorating. (*Id.*)

Plaintiff returned to general population on January 27, 2025. (*Id.*) On February 28, 2025, he was taken back to segregation for "allegedly using someone else's visits." (*Id.*) Deputy McCormack, Defendant Baumont, and non-party Sergeant Jelsomeno told Plaintiff to pack his property. (*Id.*) Plaintiff told Sergeant Jelsomeno that he was being targeted and that "literally another person literally [was] using multiple visits," but that Plaintiff was "the only person in this jail that keeps going to segregation for this." (*Id.*) Plaintiff also asked why he was being placed in segregation for a minor misconduct. (*Id.*) Defendant Baumont and Sergeant Jelsomeno told Plaintiff that he was being written up for insubordination for failing to cooperate with staff. (*Id.*)

Three days later, Defendant Baumont came to see Plaintiff for a misconduct hearing. (*Id.*) Plaintiff argued that staff were "targeting [him] to punish [him] arbitrarily." (*Id.*, PageID.9.) Deputy McCormack later told Plaintiff that he was ordered to write that misconduct "an[d] the persons who ordered it heard [Plaintiff] on the misconduct." (*Id.*) Plaintiff appealed to Defendant Faulk, who "ignored" the issue "as usual." (*Id.*) Plaintiff also spoke to Defendant Faulk, who "just ignored" Plaintiff. (*Id.*) Plaintiff avers that Defendant Misner had staff retaliating against Plaintiff to deter Plaintiff from pursuing a civil rights suit. (*Id.*) Plaintiff states that "[what is] noticeable is [he] was found not guilty of failure to cooperate but somehow of insubordination." (*Id.*)

On August 1, 2025, a deputy came and told Plaintiff to pack his property because he was going to segregation. (*Id.*) Defendant Zimmer was present, and when Plaitniff asked why he was being sent to segregation, Defendant Zimmer told Plaintiff that non-party Lieutenant Malz had ordered him to issue Plaintiff "a misconduct for any act that violates Michigan's criminal

6

statute[s]." (*Id.*) Plaintiff asked what he had done, and no one could tell him. (*Id.*) Plaintiff was then moved to segregation. (*Id.*)

On August 4, 2025, Defendants Cattes and Zimmer came and gave Plaintiff a misconduct hearing. (*Id.*) They told Plaintiff that they received a report that Plaintiff had been helping to facilitate sales of illegal firearms allegedly possessed by Plaintiff's sister. (*Id.*) Plaintiff contends that this information was not in the misconduct report and that he was "ambushed" by it. (*Id.*, PageID.10.) Plaintiff asked to present witnesses and asked Defendant Cattes to call his sister; Defendant Cattes told Plaintiff that his sister was just going to lie. (*Id.*) Plaintiff denied ever being shown illegal firearms by his sister or helping to sell illegal firearms. (*Id.*)

Plaintiff asked if Defendant Misner wrote the report, explaining that Defendant Misner had been named as a Defendant in another lawsuit filed by Plaintiff. (*Id.*) Plaintiff stated that Defendant Misner was "non-stop" harassing and targeting him, as well as his friends and family. (*Id.*) Plaintiff told Defendant Cattes that Defendant Misner was "making up lies [and was] using the staff here at KCJ to punish [Plaintiff] arbitrarily." (*Id.*) Later that night, Plaintiff received Defendant Cattes' decision on the misconduct. (*Id.*) Defendant Cattes found Plaintiff responsible after reviewing the report written by Defendant Misner. (*Id.*) Plaintiff received another ten days in segregation. (*Id.*) Plaintiff appealed. (*Id.*) He avers that he never received a response to either his appeal or his grievance. (*Id.*, PageID.11.)

Plaintiff states that because of the treatment he has received at KCJ, he has developed suicidal ideations, is always afraid that he will be placed in segregation, and is scared that anyone he has contact with will be harassed by Defendant Misner. (*Id.*) Plaintiff avers that his mental health has "deteriorated," he can barely function, and he is always depressed. (*Id.*) Plaintiff claims that his anxiety is "so bad [he] constantly shake[s]." (*Id.*) According to Plaintiff, he "[does not]

even know what [all he can be] punished for[;] they keep saying the rules are incorrect but still punish pretrial detainees for it." (*Id.*)

On August 27, 2025, Plaintiff told non-party Deputy Bement to tell Defendant Erdos that Plaintiff needed to be moved because "an incident occurred and another inmate was assaulted." (*Id.*) Plaintiff tried to stop the assault, and as a result, "another inmate pulled a razor and a knife" on Plaintiff. (*Id.*) Defendant Erdos told Deputy Bement that Plaintiff "had to either go back to where the guys tried to hurt [Plaintiff] and just [severely] assaulted another inmate or go to segregation. (*Id.*)

Based upon the foregoing, Plaintiff asserts thirteen separate claims for relief. (*Id.*, PageID.12–15.) Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages. (*Id.*, PageID.16.)

## II.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678

(quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## A.    Claims Against Non-Parties

Within the section of his complaint where Plaintiff sets forth his claims for relief, Plaintiff refers to Captain Beers and Lieutenant Dziedzic and contends that these individuals violated his Fourteenth Amendment rights. (Compl., ECF No. 1, PageID.14–15.) However, these individuals are not identified as Defendants in either the caption of the case or the section of the complaint where Plaintiff lists the Defendants in this suit. (*Id.*, PageID.1–3.)

Federal Rule of Civil Procedure 10(a) requires that a plaintiff "name all of the parties" in "[t]he title of the complaint." Fed. R. Civ. P. 10(a). Further, this Court has previously concluded that "[o]nly those individuals and entities identified in the caption of the complaint are properly considered defendants in an action, regardless of the complaint's other contents or allegations." *Jones v. Smith*, No. 1:10-cv-568, 2012 WL 726665, at *1 (W.D. Mich. Feb. 1, 2012), *R & R*

9

*adopted*, 2012 WL 726621 (W.D. Mich. Mar. 6, 2012); *see also Brown v. Mich. Dep't of Corr.*, No. 1:22-cv-16, 2022 WL 2900888, at *1 n.2 (W.D. Mich. Jul. 22, 2022) (concluding that corrections officers identified as defendants in a particular count of the complaint, but not named in the caption or in the form complaint "list of parties" were not parties to the action). Accordingly, any intended claims against Captain Beers and Lieutenant Dziedzic will be dismissed for failure to state a claim upon which relief may be granted.

### B.    Claims Against Kalamazoo County and Official Capacity Claims Against County Employees

As set forth above, Plaintiff sues Kalamazoo County itself, and also sues the individual Defendants in their official and personal capacities. Official capacity lawsuits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citing *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690, n.55 (1978)). Thus, an official capacity suit is to be treated as a suit against the entity itself. *See id.* at 166. Accordingly, Plaintiff's official capacity suit against the individual Defendants, all of whom Plaintiff identifies as employed by Kalamazoo County, is treated as a suit against the county itself.

"Under 42 U.S.C. § 1983, while a municipality can be held liable for a constitutional violation, there is no vicarious liability based on the acts of its employees alone." *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020) (citing *Monell*, 436 U.S. 690–91). Instead, a municipality "can be sued under § 1983 only when a policy or custom of that government caused the injury in question." *Id.* (citations omitted). "[T]he finding of a policy or custom is the initial determination to be made in any municipal liability claim." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). Further, the policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity, and show

that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005) (citing *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003)); *Claiborne Cnty.*, 103 F.3d at 508–09.

A policy includes a "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the sheriff's department. *See Monell*, 436 U.S. at 690. Moreover, the Sixth Circuit has explained that a custom "for the purposes of *Monell* liability must be so permanent and well settled as to constitute a custom or usage with the force of law." *Claiborne Cnty.*, 103 F.3d at 507. "In short, a 'custom' is a 'legal institution' not memorialized by written law." *Id.*

In his complaint, Plaintiff states that it is a "practice" in Kalamazoo County to deny inmates the right to call witnesses during disciplinary hearings, fail to give 24 hours' notice before a hearing is held, and fail to provide written finding after the hearings. (Compl., ECF No. 1, PageID.14.) Plaintiff avers this has happened to him five times, and that it has happened to a few other inmates at KCJ. (*Id.*, PageID.14–15.) Plaintiff suggests further that it is a "practice in [KCJ] to punish people who complain of assaults, . . . deterring inmates to come forward for fear of punishment." (*Id.*, PageID.15.) Plaintiff's conclusory statements regarding these "practices," however, is far from contending that they are "so permanent and well settled as to constitute a custom or usage with the force of law." *Claiborne Cnty.*, 103 F.3d at 507. The Court, therefore, concludes that Plaintiff's allegations against Kalamazoo County and the individuals Defendants in their official capacities essentially rest upon a theory of vicarious liability and, therefore, are subject to dismissal for failure to state a claim.

### C.    Personal Capacity Claims Against the Individual Defendants

#### 1.    Claims Against Defendants Fuller and Faulk

In Claim Ten, Plaintiff suggests that Defendants Fuller and Faulk violated his Fourteenth Amendment equal protection rights by allowing Plaintiff to be "singled out" by Defendant Misner.

(Compl., ECF No. 1, PageID.14.) In Claim Eleven, Plaintiff avers that Defendants Fuller and Faulk violated his Fourteenth Amendment due process rights by essentially maintaining a policy that denies inmates various rights during the disciplinary process. (*Id.*) In Claim Thirteen, Plaintiff argues that Defendant Fuller violated his Fourteenth Amendment equal protection and due process rights when Plaintiff "told [him and Captain Beers and Defendant Erdos] about an assault that took place and how [Plaintiff] was threatened with a weapon[, and] they placed [Plaintiff] in segregation with greater restraints and did nothing whatsoever to the assailants." (*Id.*, PageID.15.)

Plaintiff essentially seeks to hold Defendants Fuller and Faulk liable because of their respective supervisory positions at KCJ. Government officials, however, may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *See Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002); *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Sixth Circuit repeatedly has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee*, 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have

12

> interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993).

Here, Plaintiff fails to allege facts suggesting that Defendants Fuller and Faulk encouraged or condoned the conduct of the other Defendants, or authorized, approved, or knowingly acquiesced in that conduct. Rather, Plaintiff suggests that Defendants Fuller and Faulk failed to supervise, which, as set forth in *Peatross*, cannot be actionable without further allegations that Defendants Fuller and Faulk "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Peatross*, 818 F.3d at 242 (quoting *Shehee*, 199 F.3d at 300). Plaintiff has failed to do so. Moreover, while Plaintiff faults Defendant Faulk for not responding to his kites, that is insufficient to establish § 1983 liability. *See Shehee*, 199 F.3d at 300.

Additionally, to the extent that Plaintiff seeks to assert constitutional claims against Defendant Faulk regarding the handling of Plaintiff's grievances, Plaintiff cannot do so. Plaintiff has no due process right to file a prison grievance. The courts have held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy*, 30 F. App'x 568, 569–70 (6th Cir. 2002); *Carpenter v. Wilkinson*, No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at

13

*1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, the alleged conduct by Defendant Faulk could not have deprived Plaintiff of due process.

Furthermore, Plaintiff's right to petition government is not violated by any failure to process or act on his grievances. The First Amendment "right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999); *see also Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) (holding the right to petition protects only the right to address government; the government may refuse to listen or respond).

Finally, any actions by Defendant Faulk related to Plaintiff's grievances have not barred Plaintiff from seeking a remedy for his grievances. *See Cruz v. Beto*, 405 U.S. 319, 321 (1972). "A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 F. App'x 411, 415–16 (6th Cir. 2014) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)). Indeed, Plaintiff's ability to seek redress is underscored by his *pro se* invocation of the judicial process. *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982). Even if Plaintiff had been improperly prevented from filing a grievance, his right of access to the courts to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances, and he therefore cannot demonstrate the actual injury required for an access-to-the-courts claim. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury); *Bounds v. Smith*, 430 U.S. 817, 821–24 (1977), *overruled in other part by Lewis v. Casey*, 518 U.S. 343 (1996). The exhaustion requirement only mandates exhaustion of *available* administrative remedies. *See* 42 U.S.C. § 1997e(a). If Plaintiff were improperly denied

access to the grievance process, the process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action. *See Ross v. Blake*, 578 U.S. 632, 640–44 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio,* 20 F. App'x 469, 470–71 (6th Cir. 2001).

Accordingly, for each of the foregoing reasons, the Court will dismiss Plaintiff's claims against Defendants Fuller and Faulk.

### 2.    First Amendment Retaliation Claim

As part of his third claim for relief, Plaintiff contends that Defendant Misner retaliated against him, in violation of the First Amendment, by constantly sending messages, harass[ing] [him, and] punish[ing] [him] to stop filing complaints against him." (Compl., ECF No. 1, PageID.12.)

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.*

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (N.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985). However, "alleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'"

*Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987));
*see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported
by mere conclusory statements, do not suffice."); *Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th
Cir. 2004) (without more, conclusory allegations of temporal proximity are not sufficient to show
a retaliatory motive).

Here, there is no doubt that filing a lawsuit regarding a violation of constitutional rights
constitutes protected conduct. *See, e.g.*, *Bell v. Johnson*, 308 F.3d 594, 607 (6th Cir. 2002) (noting
that "[t]he en banc court in *Thaddeus-X* held that [plaintiff's civil rights lawsuit] was protected
conduct"). Moreover, Plaintiff's receipt of misconducts, which led to his placement in isolation or
segregation, is the sort of adverse action that might deter a person of ordinary firmness from
engaging protected conduct. *See Brown v. Gray*, No. 21-3386, 2022 WL 961246, at *5 (6th Cir.
Mar. 28, 2022) (noting that "*Hill* and *Thaddeus-X* clearly established that placing a prisoner in
administrative segregation and transferring him to a less desirable housing area are adverse
actions").

However, with respect to the third prong—retaliatory motive—Plaintiff merely alleges the
ultimate fact of retaliation with respect to Defendant Misner. First, Plaintiff sets forth no ***facts*** from
which the Court could infer that Defendant Misner was even aware that Plaintiff had filed a lawsuit
against him. Moreover, Plaintiff has not set forth any allegations from which the Court could infer
that Defendant Misner directed that Plaintiff receive misconducts and be placed in isolation or
segregation because of Plaintiff's protected conduct. The Court simply cannot infer anything about
Defendant Misner's motivation and reasoning from Plaintiff's vague and conclusory allegations.
Plaintiff instead appears to ask this Court to fabricate plausibility to his retaliation claim against
Defendant Misner from mere ambiguity; however, ambiguity does not support a claim. It is

Plaintiff's obligation at this stage in the proceedings to plead enough factual content to permit the Court to draw a reasonable inference that Defendant Misner acted with retaliatory intent. *See Iqbal*, 556 U.S. at 679. Because Plaintiff has not met that initial burden, the Court will dismiss his First Amendment retaliation claim against Defendant Misner.

### 3. Fourteenth Amendment Claims

#### a. Equal Protection

Plaintiff also raises Fourteenth Amendment equal protection claims against several of the remaining Defendants. Specifically, Plaintiff contends that his equal protection rights were violated when: (1) Defendant Toth issued him a false misconduct (Claim One); (2) Defendant Misner targeted Plaintiff by writing false misconducts and having other staff write misconducts to have Plaintiff placed in segregation (Claim Three); (3) Defendant Crump issued a false misconduct against Plaintiff for misuse of medications (Claim Five); and (4) Defendant Misner falsified a report against Plaintiff on August 1, 2025 (Claim Eight). (Compl., ECF No. 1, PageID.12–13.)

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const. amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state an equal protection claim, Plaintiff must plead facts to show "intentional and arbitrary discrimination" by the state; that is, he must show that he "has been intentionally treated differently from others similarly situated." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). Further, "[s]imilarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)).

17

Plaintiff's complaint contains no facts or allegations to support his equal protection claims. First, with respect to Defendants Toth and Crump, Plaintiff alleges no ***facts*** from which the Court could infer that Defendants Toth and Crump intentionally treated Plaintiff differently from other similarly situated detainees when they issued misconducts to Plaintiff. The only mention of other inmates in Plaintiff's complaint is when Plaintiff alleges that "another person literally is using multiple visits and [Plaintiff was] the only person in this jail that keeps going to segregation for this." (Compl., ECF No. 1, PageID.8.) Plaintiff also states, in a conclusory fashion, that detainee Killian Pratt, "who is a white man[,] constantly every day used somebody else's visits . . . and was never place[d] in segregation." (*Id.*, PageID.14.) Despite Plaintiff's mention of Pratt's race, Plaintiff sets forth no facts from which the Court could infer that Plaintiff was treated differently from Pratt because of Plaintiff's race. Furthermore, Plaintiff fails to set forth facts showing how Pratt was similarly situated to Plaintiff in all relevant respects. Instead, Plaintiff's allegations of discriminatory treatment are wholly conclusory and fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Accordingly, Plaintiff's Fourteenth Amendment equal protection claims will be dismissed.

### b.    Conditions of Confinement

As part of his sixth claim for relief, Plaintiff contends that Defendant Wheatley was "deliberately indifference to [Plaintiff's] conditions of confinement when [Plaintiff] told him [he] had no drinking water an[d] it had been 4 days an[d] he did nothing to ensure that [Plaintiff] was given some water." (Compl., ECF No. 1, PageID.13.)

While Plaintiff references deliberate indifference, pretrial detainees like Plaintiff are protected under the Due Process Clause of the Fourteenth Amendment. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018). Until recently, the Sixth Circuit "analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same

18

rubric.'" *Greene v. Crawford Cnty.*, 22 F.4th 593, 605 (6th Cir. 2022) (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021)). However, in 2015, the Supreme Court differentiated the standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment's Due Process Clause from those brought by convicted prisoners under the Eighth Amendment. *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *Kingsley* left unanswered the question of "whether an objective standard applies in other Fourteenth Amendment pretrial-detainment contexts." *Brawner*, 14 F.4th at 592.

Subsequently, in *Brawner*, the Sixth Circuit modified the second prong of the deliberate indifference test applied to pretrial detainees to require only recklessness. *Id.* at 592, 596. At issue in *Brawner* was a pretrial detainee's claim for deliberate indifference to medical needs. The Sixth Circuit held that to demonstrate deliberate indifference, "[a] pretrial detainee must prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* at 596 (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). He or she must prove that the defendant acted "deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (citation and quotation marks omitted).

*Brawner*, however, "left the [objective] prong untouched." *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022). Under that prong, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth [or Fourteenth] Amendment." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam). "[R]outine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes v. Chapman*, 452 U.S. 337,

347 (1981)). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

With respect to the lack of water, Plaintiff alleges that on the Wednesday during that four-day period, Defendant Wheatley came to see Plaintiff to conduct a misconduct hearing. (Compl., ECF No. 1, PageID.7.) During that time, Plaintiff told Defendant Wheatley that he had no drinking water and was thirsty; Defendant Wheatley said he "would have maintenance check it out." (*Id.*) On Thursday, maintenance tried to fix Plaintiff's sink to no avail. (*Id.*)

Here, the facts alleged by Plaintiff are contrary to Plaintiff's conclusory statement that Defendant Wheatley recklessly disregarded the situation regarding Plaintiff's access to water. Nowhere in the body of his complaint does Plaintiff set forth any facts from which the Court could infer that he explicitly told Defendant Wheatley that he had not had any water to drink for four days. In fact, Plaintiff explicitly sets forth that non-party Nurse Becky gave him water to drink the day before Defendant Wheatley came to see Plaintiff. (Compl., ECF No. 1, PageID.7.) Furthermore, as soon as Plaintiff told Defendant Wheatley about the issue, Defendant Wheatley told Plaintiff that he "would have maintenance check it out." (*Id.*)

In light of the facts alleged by Plaintiff, the Court cannot conclude that Defendant Wheatley acted "deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Brawner*, 14 F.4th at 596 (citation and quotation marks omitted). Accordingly, for the reasons set forth above, Plaintiff's Fourteenth Amendment conditions of confinement claim against Defendant Wheatley will be dismissed.

### c.    Due Process (False Misconducts and Placement in Segregation)

Plaintiff's remaining claims for relief allege violations of his Fourteenth Amendment due process rights premised upon his receipt of false misconducts and his subsequent placement in

segregation. Plaintiff asserts these claims against remaining Defendants Toth, Erdos, Zimmer, Misner, Wheatley, Powell, Crump, Baumont, and Cattes.

The elements of a procedural due process claim are (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).

In *Sandin v. Conner*, the Supreme Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. 515 U.S. 472, 484 (1995). According to that Court, a prisoner is entitled to the protections of due process only when the change in conditions "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 486–87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995). Without a protected liberty interest, a plaintiff cannot successfully claim that his due process rights were violated because "[p]rocess is not an end in itself." *Olim*, 461 U.S. at 250. For example, in *Sandin*, the Court held that regardless of the mandatory language of the prison regulations, the inmate did not have a liberty interest because his placement in administrative segregation did not constitute an atypical and significant hardship within the context of his prison life. *Sandin*, 515 U.S. at 484; *see also Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997).

Nowhere in Plaintiff's complaint does he set forth allegations suggesting that his placement in segregation had any impact on the duration of his stay in pretrial detention. Moreover, Plaintiff

fails to allege that he suffered an "significant and atypical deprivation." Confinement in segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). Thus, it is considered atypical and significant only in "extreme circumstances." *Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010). Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden-Bey*, 524 F.3d at 794.

In *Sandin*, the Supreme Court concluded that placement in segregation for 30 days did not impose an atypical and significant hardship. *Id*. Similarly, the Sixth Circuit has held that placement in administrative segregation for two months does not require the protections of due process. *See Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010) (finding that 61 days in segregation is not atypical and significant). Instead, generally only periods of segregation lasting for several years or more have been found to be atypical and significant. *See, e.g., Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (concluding that thirteen years of segregation implicates a liberty interest); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) (finding that eight years of segregation implicates a liberty interest); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008) (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, i.e., three years without an explanation from prison officials, implicates a liberty interest).

Here, the facts alleged by Plaintiff occurred over a period of approximately five months. Plaintiff does not allege any facts that the conditions he faced in segregation were not so atypical of conditions in pretrial detention that Plaintiff suffered a deprivation that was either atypical or significant. Accordingly, because Plaintiff's allegations fail to implicate a liberty interest, his

Fourteenth Amendment due process claims related to the issuance of misconducts and his placement in segregation will be dismissed.

### D.    Intentional Infliction of Emotional Distress (Claim Twelve)

Plaintiff contends that Defendants Faulk, Toth, Erdos, Zimmer, Misner, Wheatley, Baumont, and Cattes intentionally inflicted emotional distress upon Plaintiff when they denied him due process and kept placing him in segregation. (Compl., ECF No. 1, PageID.15.)

In Michigan,

> "To establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Hayley v. Allstate Ins Co*, 262 Mich. App. 571, 577, 686 N.W.2d 273 (2004) (quotation marks and citation omitted). "The conduct complained of must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (quotation marks and citation omitted). "It is for the trial court to initially determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Id.*

*Kosch v. Traverse City Area Pub. Schools*, --- N.W.3d ----, 2024 WL 3907351, at *14 (Mich. Ct. App. Aug. 22, 2024). Here, Plaintiff's complaint is devoid of facts from which this Court could infer that the conduct of any of the Defendants listed above rose to the level of "extreme and outrageous," nor does Plaintiff set forth any facts regarding any severe emotional distress that he suffered. Quite simply, the Court cannot conclude that these Defendants' conduct exceeded "all possible bounds of decency" from the facts set forth in Plaintiff's complaint. The Court, therefore, will dismiss Plaintiff's claims of intentional infliction of emotional distress.

### <u>Conclusion</u>

Having conducted the review required by the PLRA, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $605.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $605.00 appellate filing fee in one lump sum.

A judgment consistent with this opinion will be entered.


Dated:   October 8, 2025                           /s/ Paul L. Maloney
                                                   Paul L. Maloney
                                                   United States District Judge

24